HYDRAULIC RACE COMPANY, Plaintiff, *v.* FREDERICK STUART GREENE, Individually, etc., and Others, Defendants.

Supreme Court, Albany County, October 27, 1928.

*Henry W. Killeen* and *Francis J. Maloney,* for the plaintiff.

*Randall J. LeBoeuf, Jr.,* for the defendants Greene and State of New York.

*B. G. Stockwell,* for the defendant Western Block Company.

*William W. Starrs,* for the defendants Lockport Light, Heat and Power Company and others.

Hiscock, Referee. Stripped of technicalities this action was brought to establish the right of plaintiff to certain canal waters developed at the head of the locks near Lockport in excess of what

was needed for the operation of said locks and to restrain the defendant Greene from interfering with the use by it and its grantees of such waters. Originally the other present defendants were not parties to the action but on an application made by plaintiff the State and plaintiff's grantees were made parties to the action with certain limitations on the questions to be determined so far as such grantees are concerned. The plaintiff claims that it had a right to make the State a party because this action is one to determine conflicting rights in real estate. But however this may be, no appeal was ever taken by the State or any of the other defendants who were thus brought in from the order directing them to be made parties.

Near Lockport there are located in the present Barge canal as there were in the original Erie canal which it has superseded, a series of locks by which to enable boats to ascend and descend a drop of about fifty feet from the canal level extending from Lake Erie to Lockport and the easterly level extending from Lockport to Rochester. Only a small proportion of the waters delivered into the canal from Lake Erie and which reaches the head of said locks either as now or formerly existing, was or is necessary for the operation of the latter and it has been and is desirable to take this surplus water from the canal at the head of the locks and pass it around the latter and then redeliver it to the canal at the bottom of the locks where it is necessary for purposes of navigation.

It has been stipulated in this action that in the original Erie canal it was necessary for the general purposes of navigation that there should be delivered at the head of the locks as they existed 125.17 cubic feet per second of water and that of this total amount only 16.06 cubic feet were required for lockages and loss by leakage at the locks, leaving a surplus of 109.11 cubic feet per second which was surplus; that after the enlargement of the original Erie canal stipulated to have been completed in the year 1874 it was necessary for general canal purposes that there should be delivered at the head of said locks 473.14 cubic feet per second of water of which only 50 cubic feet per second were required for lockages and loss by leakage, leaving a surplus of 423.14 cubic feet per second; that for the purposes of the Barge canal now taking the place of the original Erie canal it is necessary that there should be delivered at the head of the locks 1,200 cubic feet per second of which only 250 cubic feet per second are required for lockages and lock leakages.

In view of these conditions which would result in the delivery at the head of the locks of water in excess of what was needed for their operation, there early developed a theory on the part of State authorities that leases or grants should be made of the surplus

canal waters, which it would be necessary to pass around these locks, to private individuals who might use the water power thus generated for mill purposes and thereby at the same time provide a source of revenue for the State and develop industries along the line of the canal. This policy so developed that as early as 1825 and before water had actually been turned into the canal an act was passed (Laws of 1825, chap. 275) which provided as follows:

" An Act concerning the Erie and Champlain canals. Passed April 20, 1825.

* * * * * * *

" III. And be it further enacted, That whenever, in the opinion of the canal commissioners, any water may be spared from either the Erie or Champlain canal, or any canal or work which has been or shall be constructed by the authority of the State, without injury to the navigation or safety thereof, in such case the canal commissioners are authorized to lease the said waters to such person or persons as may be willing to give the highest annual rent therefor, reserving, however, in the lease to be given, the right to limit, control or wholly resume the said waters, and all the rights granted by any such lease, whenever, in the opinion of said commissioners, or of the Legislature, the safety of such canals or works, or the necessary supply of water for the navigation of any canal which now is or hereafter may be constructed by the authority of the State, render such limitation, control or resumption necessary; and whenever any lease for waters as aforesaid shall be executed, the rent reserved therein shall be required to be paid over annually to the commissioners of the canal fund; and if at any time such rent shall remain unpaid for one year after the same shall become due, in that case the said lease shall be forfeited to the State; and the said commissioners are hereby authorized and directed to let out the same in like manner as if no lease thereof had ever been executed; but in all cases where such waters may be spared as aforesaid, it shall be the duty of the said commissioners to cause written notice to be put up in some public place near the said waters, at least thirty days previous to the execution of any lease, describing the waters which may be so spared, and stating the time when, and the place where proposals may be received for the same: Provided, That in any case where the waters, or the use thereof granted or leased by virtue of this act, are resumed as aforesaid, no damage or compensation shall be paid or allowed to any person or persons who may have made any improvement or erections in consequence of any such grant or lease."

In accordance with the provisions of this statute the Canal Commissioners determined in 1825 that there was or would be

a surplus of waters developed at the head of the Lockport locks of which a lease or grant could be made under the terms of the statute without interfering with the navigable purposes of the new canal and on June 13, 1825, notice was given "that sealed proposals will be received at the house of Seymour Scovell in the Village of Lockport from the 20th to the 25th of July next for the disposal of the surplus waters which may be spared from the canal at the waste weirs connected with the public works in Lockport in pursuance of the statute in such case made and provided," and on July 25, 1825, a sealed proposal was received from one Richard Kennedy to pay a yearly rent of $200 for said water. Kennedy, who became the successful bidder, seems to have transferred an interest in his bid to one Hatch, and on January 25, 1826, a lease or grant was made by the Canal Commissioners to said Kennedy and Hatch of "All the surplus waters which without injury to the navigation or the security of the canal may be spared from the canal at the head of the locks in the Village of Lockport, to be taken and drawn from the canal at such place in such manner as the said Canal Commissioners shall from time to time deem most advisable for the security of the canal and for the convenience of the navigation thereof," and the said Kennedy and Hatch covenanted and agreed to pay therefor to the Commissioners of the Canal Fund $200 per year. Said instrument also contained a clause by which it was expressly understood and agreed "that the Canal Commissioners reserve to themselves and to the Legislature the right to limit, control or wholly resume the said waters and all the rights granted by this lease whenever in the opinion of the said Canal Commissioners or the Legislature the safety of the canal or its appendages or the necessary supply of water for the navigation of the canal shall render such limitation, control or resumption necessary." Subsequently the rights acquired by Kennedy and Hatch under this instrument were transferred to plaintiff which in turn has made subleases to the defendants other than the State and defendant Greene.

While, as stated, at the time the statute was passed and the advertisement for bids published, the water had not yet been turned into the canal, this had been done before the lease was executed.

In accordance with the rights which were thus granted to Kennedy and Hatch a raceway or bypass was constructed on the south side of the locks through which the surplus waters were passed with necessary raceways running from the main raceway to the mills which were constructed alongside the locks.

Commencing in 1838 and actually completed in 1874 the original

Erie canal was very greatly enlarged and reconstructed and the amount of surplus water reaching the head of the locks greatly increased as has already been stated. Sometime during or shortly after this period another bypass in the form of a tunnel was constructed on the north side of the locks through which a part of the surplus waters were delivered from the head to the foot of the locks and there has also been constructed a new raceway on the south side leading from the head of the locks to a forebay from which two raceways or channels were constructed and by which through the operation of gates subject to the control of the State water could be delivered from said forebay to the mills which had been constructed or could be passed around the locks to their foot without use by the mill owners.

Beginning about 1905 there was commenced the building of the so-called Barge canal which resulted in a very great enlargement or replacement of the enlarged Erie canal which had theretofore existed and which Barge canal at the point in question followed the line of the theretofore existing canal. As already stated, the construction of this latter canal again resulted in the delivery of a greatly increased amount of surplus waters at the head of the enlarged locks which had taken the place of the original ones, and plaintiff and its grantees have continuously used in whole or part the increased amount of water resulting from the enlargement of the Erie canal and the construction of the Barge canal and passed around the locks whether by the raceway on the south or the tunnel on the north thereof. But while plaintiff and its grantees have thus used this greatly increased amount of surplus waters their rights so to do after the construction of the Barge canal have been disputed in various ways and amongst other things an attempt was made to terminate the grant or lease made to Kennedy and Hatch. It was held, however, that said grant or lease was valid and was perpetual and could not be terminated or canceled but this decision by stipulation of the parties was limited to its adjudication on the validity and perpetual character of the original grant and did not adjudicate the question whether plaintiff and its grantees under the original lease made to Kennedy and Hatch were entitled to the use of the increased amount of surplus waters which had resulted from the causes already mentioned.

Plaintiff does not claim to have acquired by prescription the right to use the waters in excess of those needed for the operation of the locks which have been developed since the Kennedy-Hatch lease was made, but bases the claim to such use upon the lease itself, and, therefore, I come to an interpretation of such lease. This interpretation involves, *first*, the construction to be drawn from the

lease itself and, *secondly*, consideration of the claim made by plaintiff that the words of the lease are ambiguous and that a practical construction thereof in favor of plaintiff's contention has been made by the State. The facts claimed by plaintiff to show such practical construction will be stated in detail in connection with the discussion of the question.

The interpretation and scope of the lease are limited and controlled by the construction to be placed on chapter 275 of the Laws of 1825, under which it was executed. That statute was the sole source of authority to the Commissioners who made the lease, and if they either intentionally or inadvertently made a lease transcending the powers conferred upon them by the statute, such excess of grant was void. So I take up the meaning of the statute to be drawn from its face, if its meaning is unambiguous, and in doing this conditions existing when it was passed and the lease under it was made and which conditions were presumably in the mind of the Legislature are to be taken into account as throwing light upon its meaning.

The lease which was authorized by the statute was perpetual in its character. If, as claimed by plaintiff, it covered all water thereafter developed in excess of that needed for the locks this inclusion reached indefinitely into the future and covered water of an unknown amount. The plaintiff's claim here is that it included excessive water developed by the fundamental enlargement of the canal which was completed in 1874 and by the construction of the Barge canal which was really a new construction and a different canal and which was completed more than eighty years after the lease was made.

The Legislature and the Commissioners may reasonably be assumed in this proceeding to have foreseen an enlargement of the canal and of the canal system as it existed in 1825 and which presumably would produce at the Lockport locks a greatly increased amount of water in excess of the needs of the locks. It was not necessary, of course, that this provision should foresee the great enlargement which was completed in 1874 or the Barge canal completed many years after. But the enthusiasm which attended the completion of the original canal and the widely optimistic views in respect of the development of this enterprise sufficiently indicate that the Legislature did contemplate enlargement. The terms of the statute and of the lease specifically indicate that the Legislature and the Commissioners had in mind enlargements and it seems to me that it would be unreasonable to interpret their acts, the statute and the lease, as intended to reach indefinitely into the future and convey all the increased waters at the Lockport

locks which might be developed by an enlargement of the canal system and the amount of which no one could estimate during an indefinite duration of time unless we are compelled to. As I view this situation from the standpoint of that time it would seem to have been an improvident act on the part of the Legislature and Canal Commissioners to have done any such thing as this, and, of course, public officials are not to be charged with improvidence in wasting or giving away the resources of the State unless such construction of their acts is reasonably necessary. I do not think that it is either necessary or fairly permissible to do this in construing the statute and the lease.

As has been stated, the pertinent part of the statute for the purposes of this question provides: " That *whenever* in the opinion of the Canal Commissioners, *any water* may be spared from either the Erie or Champlain canal, or any canal or work which has been or shall be constructed by the authority of the State, without injury to the navigation or safety thereof, in such case the Canal Commissioners are authorized to lease the said water to such person or persons as may be willing to give the highest annual rental therefor." Paraphrased somewhat the statute provides that if *at any time* in the opinion of the Canal Commissioners any water might be spared from the Erie canal without injury to the navigation or safety thereof, *said* water might be leased by the Canal Commissioners, etc. As I construe it this means and requires before any lease could be made and as a condition precedent thereto that the Commissioners should examine, deliberate and decide whether at *that* time there was water developed at the head of these locks which was not required for navigation and if so they might make a lease of *said* water, that is, the water which at that time was developed and not needed for navigation. If that interpretation of the statute, which seems quite obvious to me, is the correct one, then the lease which was made to plaintiff's predecessors was, and only could be, of the water developed at the head of these locks which at the time of the lease had been decided by the Canal Commissioners not to be necessary for the purposes of navigation and the lease did not and could not include the great additional amount of surplus water developed a great many years after the lease, first, by the enlargement of the canal and then by the substitution of the Barge canal, and the lease must be so interpreted.

The circumstance that at the time the Canal Commissioners advertised for bids for this water, the water had not been turned into the canal and that the canal was not being operated does

not seem important. As a matter of fact the water had been turned in before the lease was made and the Canal Commissioners if they thought that they had made a mistake in advertising for bids because there would be no surplus water to be rented, undoubtedly could have declined to accept the bid and make a lease. But the Commissioners were not required to wait until the canal was in full operation before deciding whether there would be water in excess of that needed for the operation of the locks. They had before them the facts which would enable them to make an estimate of the water which would be delivered at the head of the locks and of the amount of the water which would be required for operation of the latter and whether there would be a surplus and if they decided that there would be, make a lease. They were simply required to make an estimate on this subject and even though they adopted inaccurate methods their determination would be a sufficient basis for further action if so decided.

It is not especially important in this connection in my opinion to discuss the question at any length whether the interpretation most favorable to the State is to be placed upon this statute for I think that the interpretation which I have adopted is the correct one and reasonably plain and that any other interpretation would do violence to the language of the statute.

I then come to the very earnest and painstaking argument of plaintiff's counsel that the language of the statute and lease is ambiguous and that a practical construction has been placed upon them by the State through its officials and agents which is contradictory of the interpretation which I have adopted.

I shall assume that the doctrine of practical construction may be applied in a case like this except that the acts of the officials or agents of the State relied on as constituting a practical construction must be within the scope of their authority. Of course, the foundation of the doctrine of practical construction is that the meaning of a statute or contract is uncertain. The doctrine is never applied to the interpretation of a statute except in case of an ambiguity so serious as to raise a reasonable doubt in a fair mind. (*City of N. Y.* v. *N. Y. City R. Co.*, 193 N. Y. 543.) If I am correct in the views which I have already stated there is no such ambiguity here. But if it should be assumed that I am incorrect in this view it does not seem to me that the acts especially relied on by the plaintiff as indicating practical construction in its favor have that effect.

Plaintiff especially relies upon three acts or series of acts as confirming or recognizing its rights under the statute and lease to surplus waters created by the enlargement of the Erie canal

and by the construction of the Barge canal and thereby giving a practical construction by the State to their meaning.

The first act upon which it so relies is chapter 42 of the Laws of 1858, entitled " An act in relation to the Lockport Hydraulic Company." Most of this act is devoted to conferring upon said company certain rights to acquire real estate and to grant leases which are in no way indicative of a construction by the State of the original lease to Kennedy and Hatch. It is claimed, however, by plaintiff that such construction or interpretation of the lease is made by a clause in the statute reading: " In lieu of the yearly rent now payable to the State on the perpetual lease of the surplus waters at Lockport, granted by the Canal Commissioners to Richard Kennedy and Junius H. Hatch  *  *  *  it shall be lawful for said Lockport Hydraulic Co.,  *  *  *  to pay into the State treasury a principal sum on which the interest at six per cent per annum shall be equal to the annual rent aforesaid.  *  *  *  But neither such payment, nor such release, shall be construed to impair the right reserved in said lease to the Canal Commissioners or the Legislature to limit, control or wholly resume the rights granted by said lease." The words upon which plaintiff relies are the ones descriptive of the original lease as " the perpetual lease of the surplus waters at Lockport, granted by the Canal Commissioners."

I do not regard these words or the act as a whole as placing any decisive construction upon the original lease. The sole purpose which the Legislature was proposing to accomplish by the paragraph of which the words last quoted are a part, was to substitute a lump sum payment into the treasury for the payment of an annual sum by way of rent. In doing this it attempted simply to give a description of the lease to which reference was being made and too exacting tests of interpretation are not to be applied to this merely descriptive language. I think as a matter of fact the language is reasonably accurate and is not to be regarded as attempting to interpret the lease in respect of surplus waters accruing in the future. It described the lease as a " perpetual " one which was correct. That was the character of the lease as a grant and this did not determine the extent of what was granted by it. It is described as a perpetual lease " of the surplus waters at Lockport, *granted* by the Canal Commissioners " by a certain lease and I should think left the construction of the lease in respect of its grant of future surplus waters to be determined by the terms of the lease itself and did not attempt to decide in effect that that lease covered future increase of water. In other words, this phrase goes back to the question of what the Commissioners were entitled to and, therefore, did grant by the original lease.

The last sentence in the statute also has the effect of somewhat supporting the interpretation of the statute which I have given. That sentence provides that the payment being provided for shall not be " construed to impair the right reserved in said lease to the Canal Commissioners or the Legislature to limit, control or wholly resume the rights granted by said lease." This again by its reference to the lease seems to leave the right of plaintiff's predecessors to an ordinary construction and interpretation of the lease rather than to attempt to construe the lease and place upon it an interpretation by the Legislature of the rights which were granted under it.

Next, the plaintiff urges that the construction of the tunnel on the north side of the canal and the use by it and its lessees through a long number of years without objection by the State of waters in excess of those delivered at the head of the locks when the Kennedy-Hatch lease was made out, amounts to a concession by the State that plaintiff was entitled to the use of such surplus waters under the original lease and amounts to a practical construction thereof in its favor.

This tunnel was constructed by plaintiff or its predecessors sometime after 1859 and prior to 1876 or 1877. While the enlargement of the Erie canal was not completed until 1874 it perhaps may be assumed from the evidence that it had so far approached completion several years before that that an amount of water was delivered at the head of the locks for several years in excess of the amount which was delivered when the Kennedy-Hatch lease was executed. Undoubtedly the tunnel was constructed to by-pass an increased amount of water then actually being delivered at the head of the locks or anticipated in the near future. From the time this tunnel was completed until about the time when construction of the Barge canal was commenced in 1905, plaintiff and its lessees used the surplus waters which were being carried through this tunnel without serious objection and without any attempt on the part of the State to stop such use and if this conduct on the part of the State is shown to have been based on the theory that plaintiff was entitled to such increased flow under the terms of the Kennedy-Hatch lease, it would amount to a practical construction by the State of that lease. But on the other hand if it appears that such lack of objection on the part of the State was due to some other theory it would not amount to such a construction. I am inclined to think that the conduct of the State in allowing this use of excess water being by-passed through the tunnel is rather to be attributed to some other theory than the one invoked by plaintiff. The truth of the matter is

that the attitude of the State as represented by its different officials has been variable and inconsistent. Originally there was undoubtedly a widespread belief that much good in the way of securing revenue and of encouraging industries would result from leasing these surplus waters. But later from time to time there arose the feeling which was evidenced by the official acts of various State officials that owing to the disposition of mill owners who had secured rights to use surplus waters, to overstep the limitations of these rights and embarrass and impair the usefulness of the canal as a means of navigation, it was undesirable to grant such leases as the Kennedy-Hatch lease. It is not very material whether the complaints on the part of State officials of the excessive use of water by mill owners were directed against plaintiff and its predecessors and its grantees. These complaints did evidence a disposition to cease making leases and simply grant to individuals a mere revocable license to use waters which would create no vested rights and which could be terminated at any time. The result of this feeling was that in 1831 a joint resolution was adopted by the Legislature providing in substance that no more leases should be made of these surplus waters. It is true, as claimed by plaintiff's counsel, that this joint resolution did not in any compulsory way bind subsequent Legislatures. But the fact is, as evidenced in various ways, that in subsequent years this resolution was regarded as the definition of a policy by the State governing it in this matter and from the time that that joint resolution was adopted, with the exception of a few leases which can be accounted for otherwise than on the theory that the resolution had fallen into abeyance, no leases were made of these surplus waters under the original statutes. Statutes remained unrepealed which I shall assume authorized such leases to be made, but as I interpret the evidence the policy was observed of not using this authority except in a few unusual cases, and later in connection with and after the construction of the Barge canal new statutes were adopted covering this subject.

Under these circumstances, it seems to me that the attitude of the State in allowing plaintiff and its grantees to use the increased waters passing through the tunnel is not to be regarded as an acquiescence of the State acting through its officials in a use of the water under a right conveyed by the lease but as a permission which was revocable at any time and which created no vested or lasting rights in the plaintiff or its grantees. This was not only a natural attitude for the State to take under the resolution of 1831 but it was one which served the convenience of the State. With the enlargement of the canal these increased surplus waters

were being delivered at the head of the locks which it was necessary in the interest of the canal and, therefore, of the State to by-pass around the canal. The canal could not be properly operated without doing this and under such circumstances and considering this resolution of 1831 it seems to be more reasonable to hold that the State consented to a use of the surplus waters which was entirely convenient to it and which also served the purposes of industry rather than that it intended by allowing mill owners to use these waters to say in effect that it regarded them as legally entitled to such waters under the terms of the original Kennedy-Hatch lease. I am not able to believe from all of the evidence bearing on this question that the State acting through responsible officials who had the power to bind it intended to say that the Kennedy-Hatch lease gave the right to these increased surplus waters.

Still less was the construction by the State of a forebay and two raceways after the amount of surplus waters delivered at the head of the locks had increased, a recognition of plaintiff's present claims under its lease as is now argued. The fact that the water was drawn from the canal into a forebay instead of directly into raceways seems to me entirely immaterial. The delivery of the water from the forebay was through two raceways, one of which supplied the mills of plaintiff and its lessees, and the other of which simply conducted the water around the locks to the foot thereof. The gates which regulated the delivery of water from the forebay into one raceway or the other were entirely under the control of the State and enabled it to determine how much water should be passed into plaintiff's raceway. Under these circumstances I do not see that the new construction indicated any theory on the part of the State which is favorable to plaintiff's present contention. It was enabled to determine just how much water plaintiff was entitled to under its lease and to be supplied with through its raceway. Minor officials may have been accurate or not in determining this quantity. But certainly a physical construction which enabled the State to give to plaintiff and its lessees only what they were entitled to does not seem to be any admission of the amount to which they were so entitled.

If we were required or permitted to resort to practical construction as an aid to the interpretation of the statute and lease in question I should feel that the Legislature itself had placed upon them a practical construction entirely opposed to plaintiff's theory. Chapter 494 of the Laws of 1907 provided: " The waters, surplus or otherwise, created or impounded as a result of the improvement of the Erie, Champlain and Oswego canals, pursuant to the provisions of this act, or from the construction of any dam or dams,

mole or moles, reservoir or reservoirs, or other structures, connected therewith,. shall not be leased, sold or otherwise disposed of, until the improvement of said canals as contemplated in this act, and amendments thereto, shall have been finally completed, nor thereafter until authorized by statute setting forth specific terms, conditions and restrictions governing the same." That act would seem to imply the understanding and assertion on the part of the Legislature that the increased surplus waters developed at the locks had not been covered by prior leases but were still under the control of the State. This might or might not be correct, but it certainly negatived an intent on the part of the State to recognize the right of individuals like plaintiff to claim these waters as covered by outstanding leases.

Of course, the failure to discuss many arguments advanced by counsel to sustain their respective claims, is not due to inadvertence or oversight. It would be impossible to do this within any appropriate length of an opinion. They have all been considered and none of them seem to me to overthrow the views which have been expressed.

These views lead to the conclusion that plaintiff's action should be dismissed, with costs and findings in accordance herewith, and requests to find may be submitted and considered on five days' notice.